*Decision will be entered for the respondent.*

ERNEST DRUCKER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11463–79.     Filed September 30, 1982.

*Richard B. Sherman* and *Arthur Pelikow*, for the petitioner.
*Julius Jove*, for the respondent.

WHITAKER, Judge: Respondent determined a deficiency of $321 in petitioner's Federal income tax for 1976 and $265 for 1977. After concessions by the parties, the sole issue remaining for our decision is whether petitioner is entitled to a home office deduction under section 280A, I.R.C. 1954.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Ernest Drucker (petitioner) resided in New York, N.Y., at

---

the time he filed his petition herein. His Federal income tax returns for 1976 and 1977 were filed with the Brookhaven Service Center at Holtsville, N.Y.

During taxable years 1976 and 1977, petitioner was a concert violinist employed by the Metropolitan Opera Association, Inc. (hereinafter the Met), at Lincoln Center, New York, N.Y. As of 1976, petitioner had been a concert violinist for 47 years and had been with the Met for 30 of those 47 years.

Petitioner, as a member of the Metropolitan Opera Orchestra,[1] was covered by the terms of union contracts between Local 802, American Federation of Musicians (of which petitioner was a member), and the Met. During 1976 and 1977, petitioner received compensation from the Met in the amounts of $21,537.95 and $20,827.87, respectively. He was compensated by the Met for the following periods:

(a) 3 continuous pre-season rehearsal weeks;
(b) the regular New York season with a duration of no less than 27 weeks;
(c) 49 tour days (in 1976) and 48 tour days (in 1977);
(d) 2 weeks of performances in the New York City parks;
(e) 5 weeks' vacation; and
(f) 5 weeks' supplemental unemployment benefits.

During the preseason rehearsal period, the musicians would rehearse twice a day. The first rehearsal would begin at 10:30 a.m. and end at 1:15 p.m.; the second would begin at 2 p.m. and end at 4:45 p.m. This rehearsal schedule continued for 3 weeks, 5 days a week.

During the New York season, petitioner was required to play at five operatic performances per week. The running time for each performance could vary from 1 hour 36 minutes to 4 hours 55 minutes. Almost all performances during the New York season began at 8 p.m. and, depending upon the opera, ended about 11 p.m. Saturday performances began at about 2 p.m. There was no contractual requirement that the musicians arrive prior to the start of the performance. However, most did so in order to "warm up" or "tune up." Performances

---

[1]The Metropolitan Opera Orchestra consisted of 93 regular musicians during the taxable years at issue.

consumed 15 to 16 hours per week. All New York City performances were at Lincoln Center.

In addition to performing, during the New York season, the orchestra musicians were required to rehearse together as a unit at Lincoln Center. As a member of the string section, petitioner was required to participate in these rehearsals for approximately 10 or 11 hours per week. The orchestra rehearsals were either at a rehearsal room "in C level" or "in the pit," where performances took place. Thus, during the New York season, a member of the string section would spend approximately 26 hours per week at the Metropolitan Opera House at Lincoln Center playing and rehearsing. In addition, the 3 weeks of preseason rehearsals, also at Lincoln Center, consumed about 27 hours 30 minutes per week.

The Met was on tour 49 days in 1976 and 48 days in 1977. While on tour, the musicians generally did not rehearse together as a unit. The orchestra performed at night only, and during the day, the musicians were free to spend their time as they wished.

Immediately following 2 weeks of performances in the parks, the musicians received a 5-week paid vacation. During this period, the musicians were not obligated in any way to the Met and were totally free to do as they wished, including accepting independent employment, without any effect on their compensation. This contrasted with the supplemental unemployment benefits period during which time, if a musician worked independently, the supplemental unemployment benefits to be received as compensation would be reduced. During the summers of 1976 and 1977, petitioner performed for a period of 49 days each summer for the Chautauqua Institution located in Chautauqua, N.Y. For his services as a concert violinist, petitioner received compensation from Chautauqua of $3,564.75 in 1976 and $3,547.13 in 1977. The record does not disclose any other facts as to the nature of the relationship between petitioner and the Chautauqua Institution.

As a professional musician, petitioner was required to practice numerous hours in order to maintain, refine, and perfect his skill. Petitioner practices the opera in current production as well as the one in preparation. He begins his individual practice with scales and warmup exercises. He

spends considerable time on difficult technical passages, practicing those passages of the opera over and over. Rehearsals at the Met involved the entire 93-piece orchestra, differing from a performance principally due to the absence of an audience. Petitioner's parts have to be perfected prior to a rehearsal or performance, since every error can be detected by his colleagues and his conductor. An error can distract other members of the orchestra, and has the potential to disrupt the entire orchestra.

The Metropolitan Opera House at Lincoln Center does not have private studios for practice on an individual basis by the 93 members of the orchestra. Neither did the Met otherwise provide petitioner with a facility for private practice. Orchestra employees were expected to practice individually, off the premises. Practice was necessary as a practical matter in order for petitioner to carry out his obligations to the Met. Such off-premises practice, while a practical necessity for the orchestra employees, was not requested by the employer and was not a requirement or condition of employment.[2] The musicians (including petitioner) were not required to report to the Met on their practice at home. By contrast, missing a rehearsal or a performance was investigated and usually would result in a loss of pay, unless there was a legitimate reason for the absence.

During 1976 and 1977, petitioner, a widower, lived alone in a five-room apartment in New York City. One room was set aside for exclusive use as a studio. The room or studio was furnished with stereo components, record equipment, a piano, hundreds of books, records and tapes, musical scores, music

---

[2] Petitioner introduced into evidence a self-serving document signed by Abraham Marcus, orchestra manager, dated Feb. 27, 1979, and addressed "To Whom It May Concern" which concludes with the following sentence: "Accordingly, for our convenience we request that he practice in a studio other than our premises, whatever hours he deems necessary to reach the high level of performance which his position demands." Mr. Marcus, in response to a question on redirect examination as to whether practice outside the Met's premises was for the convenience of the employer stated:

A. That requires a twofold answer. Surely it is for the convenience of the Met, because if the musician plays poorly in a rehearsal or performance, it is a discredit to the Met. Also, he has to practice for himself, to make sure that he can play.

Petitioner has requested that we find that his employer "requested" him to use a studio off the Met's premises. Respondent contends that such a finding is not supported by the record. We agree with respondent on this point.

stands, a desk, and three violins. Petitioner used the studio for approximately 30 hours per week while in New York City, and his work there included practice of his musical skills, review of musical scores, and rehearsal of his numerous operatic numbers. The room was used exclusively for such purposes; it was not used for social or personal purposes.

Petitioner deducted $461 on both his 1976 and 1977 returns for expenses attributable to a home office (his studio). He now contends that instead of the $461 studio deduction claimed on his 1976 return, he is entitled to deduct $745, computed as follows:

|  | Five rooms | Studio—<br>20% of apartment |
|---|---|---|
| Rent | $3,560 | $712 |
| Electricity | 165 | 33 |
|  | 3,725 | 745 |

Similarly, petitioner now contends that instead of the $461 studio deduction claimed on his 1977 return, he is entitled to deduct $748.40, computed as follows:

|  | Five rooms | Studio—<br>20% of apartment |
|---|---|---|
| Rent | $3,560 | $712.00 |
| Electricity | 182 | 36.40 |
|  | 3,742 | 748.40 |

### OPINION

Section 280A limits the deductions for expenses in the home for taxable years beginning after December 31, 1975.[3] Section 280A(a) provides generally that "no deduction * * * shall be allowed with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence."[4]

---

[3] Sec. 601, Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1520, 1569–1572.

[4] Sec. 280A(b) provides that "subsection (a) shall not apply to any deduction allowable to the taxpayer without regard to its connection with his trade or business (or with his income-producing activity)."

Section 280A(c)(1), as recently amended, sets forth an exception to this general disallowance[5] by providing that:

(1) CERTAIN BUSINESS USE.—Subsection (a) shall not apply to any item to the extent such item is allocable to a portion of the dwelling unit which is exclusively used on a regular basis—

(A) [as] the principal place of business for any trade or business of the taxpayer,[6]

(B) as a place of business which is used by patients, clients, or customers in meeting or dealing with the taxpayer in the normal course of his trade or business, or

(C) in the case of a separate structure which is not attached to the dwelling unit, in connection with the taxpayer's trade or business.

In the case of an employee, the preceding sentence shall apply only if the exclusive use referred to in the preceding sentence is for the convenience of his employer.

However, for a use described in section 280A(c)(1) a limitation on the deductions is set forth in section 280A(c)(5) which provides that:

deductions allowed under this chapter for the taxable year by reason of being attributed to such use shall not exceed the excess of—

(A) the gross income derived from such use for the taxable year, over

(B) the deductions allocable to such use which are allowable under this chapter for the taxable year whether or not such unit (or portion thereof) was so used.

Respondent contends that petitioner has failed to show that he has satisfied one of the three prongs of section 208A(c)(1). In addition, respondent contends that petitioner has failed to show that he "satisfied the requirments of section 280A(c)(5)." Petitioner contends that his studio was his principal place of business thereby satisfying section 280A(c)(1)(A), the first prong of section 280A(c)(1), and that he is not limited by section 280A(c)(5) since the gross income derived from the

---

[5]Other exceptions to the general disallowance provision of sec. 280A(a) are set forth in sec. 280A(c)(2), (3), and (4).

[6]As we recently said in *Green v. Commissioner*, 78 T.C. 428, 431 n. 3 (1982),"Sec. 280A was amended by Pub. L. 97–119, as signed into law Dec. 29, 1981. Prior to amendment, subsec. (c)(1)(A) read '(A) as the taxpayer's principal place of business.' This amendment applies retroactively to tax years beginning after Dec. 31, 1975, except that, for tax years after Dec. 31, 1975, and before Jan. 1, 1980, the amendment applies 'only to taxable years for which, on the date of the enactment of this Act, the making of a refund, or the assessment of a deficiency, was not barred by law or any rule of law.' Sec. 113(e)."

business use of his principal place of business far exceeds the deductions attributable thereto.

The parties are in disagreement as to the findings of fact which can be made on this record as to the employer's request that petitioner use a studio off the premises of the employer. Petitioner contends that he has demonstrated that use of the apartment was for the convenience of the Met, but without citation of authority. Respondent has not briefed this issue, but we are not convinced that the issue has been conceded. However, since we hold in this case for the reasons set forth herein, that petitioner's principal place of business is not in the "studio" in petitioner's apartment, we need not decide whether the "convenience of the employer" requirement or that of section 280A(c)(5) is met.

Congress enacted section 280A to provide "definitive rules relating to deductions for expenses attributable to the business use of homes." S. Rept. 94–1236 (Conf.) (1976), 1976–3 C.B. (Vol. 3) 807, 839. Also see H. Rept. 94–658 (1976), 1976–3 C.B. (Vol. 2) 695, 852; S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 49, 185; Staff of the Joint Comm. on Taxation, 94th Cong., 2d Sess., General Explanation of the Tax Reform Act of 1976, 1976–3 C.B. (Vol. 2) 1, 151. Prior to the enactment of section 280A, we employed an "appropriate and helpful" standard in determining whether a home office deduction was proper.[7] Congress, in specifically rejecting that standard, opted for a less "subjective determination" and intended to set out clear rules in order to alleviate administrative burdens which it believed were inherent in such a standard. H. Rept. 94–658, *supra*, 1976–3 C.B. (Vol. 2) at 852; S. Rept. 94–938, *supra*, 1976–3 C.B. (Vol. 3) at 185; Joint Comm. Explanation, *supra*, 1976–3 C.B. (Vol. 2) at 151. Congressional dissatisfaction with the "appropriate and helpful" standard, however, was not limited to the perceived inherent administrative problems; Congress also felt that such

---

[7]*Bodzin v. Commissioner*, 60 T.C. 820 (1973), revd. 509 F.2d 679 (4th Cir. 1975), cert. denied 423 U.S. 825 (1975); but see *Sharon v. Commissioner*, 66 T.C. 515 (1976), affd. per curiam 591 F.2d 1273 (9th Cir. 1978), cert. denied 442 U.S. 941 (1979), in which we overruled *Bodzin.* See also H. Rept. 94–658 (1976), 1976–3 C.B. (Vol. 2) 695, 849–850; S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 49, 183; Staff of the Joint Comm. on Taxation, 94th Cong., 2d Sess., General Explanation of the Tax Reform Act of 1976, 1976–3 C.B. (Vol. 2) 1, 149, where *Bodzin* as well as other decisions of this Court are cited.

a standard would result in treating nondeductible personal living expenses as ordinary and necessary business expenses.[8] H. Rept. 94–658, *supra*, 1976–3 C.B. (Vol. 2) at 852; S. Rept. 94–938, *supra*, 1976–3 C.B. (Vol. 3) at 185; Joint Comm. Explanation, *supra*, 1976–3 C.B. (Vol. 2) at 151.

With this legislative history as background, we proceed to analyze the contentions of the parties. We do not need to consider section 280A(c)(1)(B) or section 280A(c)(1)(C) since petitioner makes no contention as to those sections.

The legislative history unfortunately offers little guidance as to the scope of "principal place of business" as that term is employed in section 280A. *Baie v. Commissioner*, 74 T.C. 105 (1980). It is clear, however, that a taxpayer can have only one principal place of business for each business in which he is engaged. *Green v. Commissioner*, 78 T.C. 428, 433 (1982); *Curphey v. Commissioner*, 73 T.C. 766 (1980). As we said in *Baie v. Commissioner, supra* at 109, "We therefore take it that what Congress had in mind was the focal point of a taxpayer's activities." See also *Green v. Commissioner, supra* at 433; *Jackson v. Commissioner*, 76 T.C. 696, 700 (1981).

While the number of hours worked at the various places at which business is transacted is a factor to be considered, it is not controlling. *Green v. Commissioner, supra* at 433. See also *Jackson v. Commissioner, supra.* As a necessary ingredient, we must examine the nature of the taxpayer's trade or business, the various activities of which it is constituted, and the locations where those activities are carried out.

In this case, petitioner was an employee of the Met. We have held time and again that an employee is in the trade or business of being an employee, here being a concert musician for the Met. *Primuth v. Commissioner*, 54 T.C. 374 (1970). In the pursuit of this trade or business, petitioner is not in a

---

[8]"In many cases the applicaiton of the appropriate and helpful test would appear to result in treating personal living, and family expenses which are directly attributable to the home (and therefore not deductible) as ordinary and necessary business expenses, even though those expenses did not result in additional or incremental costs incurred as a result of the business use of the home. Thus, expenses otherwise considered nondeductible personal, living, and family expenses might be converted into deductible business expenses simply because, under the facts of the particular case, it was appropriate and helpful to perform such portion of the taxpayer's business in his personal residence. * * * [H. Rept. 94–658, *supra*, 1976–3 C.B. (Vol. 2) at 852; S. Rept. 94–938, *supra*, 1976–3 C.B. (Vol. 3) at 185.]"

separate trade or business of being a professional musician as might be the case under other facts.[9] Thus, we must look at petitioner's activities both from his viewpoint and also from that of his employer, at least with respect to that part of the Met's business which utilized the services of petitioner.

These activities may be divided into three separate categories: practice, rehearsal, and performance. Practice in this context refers to individual practice off the premises of the Met (in petitioner's case, at his apartment or in his hotel room when on tour). Rehearsals were of the entire orchestra at Lincoln Center, and performances were either there, on the road, or in the New York City parks. While we recognize that petitioner, when not on tour, may have worked a few more hours during the week at his apartment than at Lincoln Center, we, nevertheless, conclude that the focal point of his activities was at Lincoln Center. His practice was admittedly essential to maintain his technical expertise and to learn or review the particular music to be played. However, his job *required* that he attend the rehearsals at Lincoln Center and, of course, the performances. A day of missed practice would not be known to the employer. But a missed rehearsal or performance normally would result in his pay being docked.

Without the performances, the Met would not exist. For an organization such as the Met and its musicians, by far the most important business location is the place where public performances are held, Lincoln Center during most of the orchestra's playing year. It is only at the performances that the Met and its musicians are judged by the public. The sole reason for the existence of this orchestra is to perform as a group for the public, and these performances consumed a significant amount of petitioner's workweek. With some artists, physical presence of the individual is not required for public showing. For example, the public will rarely watch the painter painting in his studio. The completed product may be displayed in a museum or gallery. That is not the case with this orchestra.

---

[9]We cannot determine from this record whether or not petitioner's performance for Chautauqua Institution was as an employee. That is, however, irrelevant to the determination of whether or not petitioner's "studio" in his apartment was his principal place of business, since, in any event, he did not use his apartment when practicing for the Chautauqua performances.

The joint rehearsals at Lincoln Center were another important activity. They were essential to enable the Met to maintain its performance quality. Of even more importance to petitioner, he, himself, was judged at each rehearsal. His retention of his job depended on the quality of his playing at rehearsals as well as at the public performances. These two activities consumed only slightly less of his workweek than his individual practice. Thus, the time factor differential becomes of no importance in this case. From the Met's standpoint, clearly the intended focal point of petitioner's activities was Lincoln Center. We conclude that was true also from petitioner's standpoint.

Petitioner argues, by analogy, that the trial lawyer's principal place of business is not in the courtroom. We agree. The focal point of the trial lawyer's business is where he meets the clients, prepares his cases, and administers his law practice, that is, his law office. But the correct analogy would be, we suggest, to the trial lawyer on the staff of a corporate or Government law department.[10] The corporate lawyer will have an office, a library, his support staff, and his clients on the premises of his employer. Regardless of the time spent in the courthouse, the focal point of the activities is on the employer's premises. And when the lawyer has an office in the home, as many corporate and Government lawyers do, it may be that maintenance of such home office would be deemed to be "appropriate and helpful" but not necessarily deductible under section 162. See and compare *Bodzin v. Commissioner*, 509 F.2d 679 (4th Cir. 1975), cert. denied 423 U.S. 825 (1975), revg. 60 T.C. 820 (1973), and *Sharon v. Commissioner*, 66 T.C. 515 (1976), affd. 591 F.2d 1273 (9th Cir. 1978), with *Newi v. Commissioner*, 432 F.2d 998 (2d Cir. 1970), affg. a Memorandum Opinion of this Court. However, Congress disavowed that subjective case-by-case analysis in the enactment of section 280A. Similarly, here we consider that petitioner's use of his apartment was certainly "appropriate and helpful"; in fact, it was necessary from petitioner's standpoint, but more than that is now required. We have no choice but to apply the very strict standard imposed by Congress in the "office in the

---

[10]See, e.g., *Bodzin v. Commissioner, supra.*

home" situation. We conclude that petitioner has failed to demonstrate that the "studio" in his apartment was his principal place of business for his activities as an employee of the Met. On this record, that studio was not used at all in connection with the Chautauqua performances. Therefore, we hold for respondent.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

TANNENWALD, *Chief Judge*, concurring: I am in full agreement with the majority and append these few comments to pinpoint an issue under section 280A with which we may well have to deal in the future. It seems to me that the majority and the dissenters, particularly the latter, are proceeding on the assumption that every taxpayer engaged in a trade or business must have a "principal place of business." I do not think this is necessarily the case. In certain situations, the conduct of the taxpayer's trade or business may be sufficiently diffused among a number of places (including the taxpayer's residence) that there may be no "principal place of business" within the meaning of section 280A. Compare *Rosenspan v. United States*, 438 F.2d 905 (2d Cir. 1971), and *Six v. United States*, 450 F.2d 66 (2d Cir. 1971). See also *Montgomery v. Commissioner*, 64 T.C. 175, 180–181 (1975), affd. 532 F.2d 1088 (1976).

PARKER, *J.*, agrees with this concurring opinion.

WILBUR, *J.*, dissenting: I respectfully dissent. Petitioner was a concert musician during the taxable years 1976 and 1977. In addition to performing with the Metropolitan Opera at Lincoln Center, the New York City parks, and the various cities in which the Metropolitan performed while on tour, petitioner performed for 49 days each summer in 1976 and 1977 in Chautauqua, N.Y. During those years, petitioner also spent numerous hours rehearsing, practicing, and reviewing in his effort to maintain, refine, and perfect his skill. Petitioner contends that his principal place of business was his studio

where he conducted this continuous and unceasing work of his trade or business, the trade or business of a professional musician, and that the Lincoln Center, the New York City parks, Chautauqua, and the facilities in tour cities were simply the places where the fruits of his work surfaced. I agree.

It may be that in the commercial world, the principal place of business is (as the majority again holds) where the goods or services are exchanged. But this is not always the case, particularly as commerce in the "business" sense becomes more remote. Surely the principal place of business of the author-lecturer is not the place where the rights to his works are transferred or the lectures delivered. Cf. *Gestrich v. Commissioner*, 74 T.C. 525 (1980), affd. without published opinion 681 F.2d 805 (3d Cir. 1982). Rather it is where he continually and regularly devotes his time and effort. The painter does not consider that the principal place of his activities is where his paintings are sold or exhibited; rather it is where he uses his extraordinary skill practicing, experimenting, revising, and perfecting his craft to produce the many works of art that are then shown to the public through an exhibit or sold. Similarly, a classical musician may give performances on the guitar, violin, piano, or flute at various performing art centers. But surely, the studio where the musician perfects his craft during countless hours of meticulous, intense, and concentrated practice is his principal place of business rather than the auditorium where he exhibits his skills. In this vein, I do not agree that the principal place of a concert musician's activities is necessarily one or more of the places where his performances take place.

In a case where there are several places of business, as in the case at bar where, at one place, petitioner plays without the benefit of an audience, practices, studies, and reviews scores on a regular basis, and at several others, plays with the benefit of an audience, the principal place of business is the one of primary or leading significance to the taxpayer in performing his business functions. It is where the majority of his business activities are accomplished. From a careful examination of the entire record and the legislative objective of section 280A, it is clear that petitioner's home studio was the principal place of his trade or business as a concert musician.

Petitioner spent most of his workday reviewing musical

scores, practicing his musical skills, and perfecting his parts of numerous operatic scores. Petitioner's procedures were absolutely necessary to the maintenance and further development of his professional skills. Admittedly, bare necessity is not enough to satisfy section 280A. However, when the necessary parts, the fundamental parts, of the work in a trade or business occur principally at one place, that place is the principal place of the trade or business. In this case, petitioner spent the necessary parts, the fundamental parts, of his work as a professional concert musician principally at his studio, and the several places of performance were the places where his skills were exhibited.

This accords with the purpose Congress had in mind in enacting section 280A. The vast majority of individuals, whether employed or self-employed, work at an office, school, hospital, store, factory, or other facility, Monday through Friday, 9 a.m. to 6 p.m., 50 weeks a year, holidays excepted. Yet prior to the enactment of section 280A, a lawyer employed by a corporation or Government agency was able to deduct a portion of the costs of his personal dwelling if he completed work at home that was not finished at the office. See *Bodzin v. Commissioner*, 60 T.C. 820 (1973), revd. 509 F.2d 679 (4th Cir. 1975), cert. denied 423 U.S. 825 (1975). Congress specifically focused on this situation (H. Rept. 94–658 (1976), 1976–3 C.B. (Vol. 2) 695, 850; S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 49, 145) in fashioning the remedial legislation of section 280A and in using the words "principal place of business." Under any sensible criteria, the principal place of business of nearly all taxpayers is the school, office, hospital, store, or other physical facility where they toil regularly, day after day, week after week, year after year.

Thus, an elementary school teacher has a classroom in a school where she teaches, day in and day out, with free periods when her class is at gym and music. The school day is from 8 a.m. to 4 p.m. at a local high school where a math teacher teaches six periods, with one period for lunch and one free period for planning. If these teachers fail to complete their lesson plans during their free periods, they may, like the lawyer in *Bodzin*, finish them at home. In these and similar

cases, Congress clearly intended to deny a home office deduction.[1]

Similarly, an individual running a prosperous hot dog stand on a busy street of a major city will toil at that facility every business day. At that retail establishment, supplies are delivered, bills are received, employees work and are supervised, and customers are served. There, all products are packaged and sold, and all gross receipts received. Accordingly, that location is the principal place of business, even though *some* of the food is prepared in the personal kitchen of the taxpayer's residence at the end of the business day. And this, of course, would be true whether the basic product at a franchise location is hot dogs, hamburgers, or pizza. See *Baie v. Commissioner*, 74 T.C. 105 (1980).[2]

The circumstances of a concert musician are uniquely different. Aside from his musical instrument, nothing is more essential to a concert musician than his studio. There he keeps his skills finely tuned, learns new parts, reviews difficult passages, and perfects his performance of the music he will play for the public. He listens to performances—his own and others—on tapes or records. When he plays at various concert halls (solo, in a string quartet, or in an orchestra) we hear the end result of all these efforts.

Petitioner exhibits his skills principally with the Met, but in the final analysis, he should not be treated differently from other classical musicians. He is a performing artist exhibiting his talents at various facilities—the Lincoln Center, the concert halls in various tour cities, the New York City parks, and Chautauqua.[3] The Lincoln Center was the principal

---

[1]See *Besch v. Commissioner*, T.C. Memo. 1982–15 (elementary school principal); *Strasser v. Commissioner*, T.C. Memo. 1981–523 (university professor); *Weightman v. Commissioner*, T.C. Memo. 1981–301 (university professor); *Cousino v. Commissioner*, T.C. Memo. 1981–19, affd. 679 F.2d 604 (6th Cir. 1982); (junior high school teacher); *Chauls v. Commissioner*, T.C. Memo. 1980–471 (music teachers); *Kastin v. Commissioner*, T.C. Memo. 1980–341 (physical education teacher and track and field coach). See also *Jackson v. Commissioner*, 76 T.C. 696 (1981).

[2]It is, of course, possible that a taxpayer may own several hot dog or hamburger stands or Pizza Huts, each run by a manager. If the taxpayer has a central office from which the businesses are collectively managed, the central office may be his principal place of business, rather than one or more of the retail facilities. Not surprisingly, it is often the close cases presenting the greatest difficulty that are litigated. In the final analysis, the appropriate resolution depends on all of the facts and circumstances presented.

[3]In the years before us, the W–2 forms attached to petitioner's returns show small

artistic center where his skills were exhibited to the public (as one gallery may be the principal facility where an artist's paintings are exhibited), but the question here is where his principal place of business is. The majority erroneously equates the term "principal place of business" with the principal place of public performance.

Similarly, respondent was wrong in originally suggesting that the Met is petitioner's principal place of business. The Met is an organization, not a physical location. Respondent's final position is that petitioner's principal place of business "was wherever the Met Orchestra rehearsed or performed, whether it be at Lincoln Center, the various tour cities visited during the tour or the park performances which the orchestra played." This ubiquitous view—which ironically enough leaves out only Chautauqua—serves only to demonstrate the absurdity of equating a concert hall with the market place in the case of a concert musician. Unfortunately, this is precisely the error the majority commits.

A performing artist in petitioner's circumstances is not even a piece of the evil Congress sought to remedy in enacting section 280A. Abraham Marcus, orchestra manager of the Met, made it clear that not only was it presumed, but it was expected that petitioner would continually and unceasingly practice on an individual basis,[4] and such individual work was required to perform in the manner in which the position demanded. This intense and concentrated year-round practice on an individual basis, required of any truly successful concert musician, was also required to enable petitioner to perform at Chautauqua for 49 days (the better part of 2 months) during the summer, for which he earned a significant portion of his performance income (approximately 17 percent in each year). Nothing more graphically illustrates the fundamental misconception the majority has of a musician's life than its statement

---

amounts of income from sources in addition to the Met or Chautauqua institutions. He received income in 1976 from Amato Opera Theatre, Inc., New York City, and in 1976 and 1977 from the Phonograph Record Manufacturers Special Payment Fund. Nearing the twilight of his career, petitioner may have curtailed his activities somewhat more than the typical concert musician playing (as he does) at the highest level.

[4] A musician without the benefit of sufficient individual work could affect and disrupt the entire 93-member orchestra.

that petitioner "did not use his apartment when practicing for the Chautauqua performances."

The Metropolitan Opera House at Lincoln Center was the facility where the Met most often performed while in New York City, but it did not contain studios where any of the 93 musicians in the orchestra could practice on an individual basis, and the Met did not provide a facility for that integral, fundamental, and principal aspect of the concert musician's work. Thus, petitioner is quite different from the university professor[5] (see H. Rept. 94–658, *supra*, 1976–3 C.B. (Vol. 2) at 852; S. Rept. 94–938, *supra*, 1976–3 C.B. (Vol. 3) at 185; Staff of the Joint Comm. on Taxation, 94th Cong., 2d Sess., General Explanation of the Tax Reform Act of 1976, 1976–3 C.B. (Vol. 2) 151), and the real estate salesmen who merely exercise a personal preference by using an area of their home rather than the other facilities available to them.

The demarcation of the term "principal place of business" is seldom an easy one. But line drawing is the daily grist of judicial life, and we should not make it easier by drawing a circle so large that the difficult cases just outside the perimeter simply disappear within. Congress expects no such mechanical performance and Justice Holmes has admonished us not to be "troubled by the question where to draw the line. That is the question in pretty much everything worth arguing in the law." *Irwin v. Gavit*, 268 U.S. 161, 168 (1925). Congress has given us the pencil for individual cases along with a general schematic outline that surely does not include a concert musician in petitioner's circumstances. Since his quite unique circumstances are no part of the evil Congress envisioned, we should not draw him into any judicial picture of section 280A.

The majority sees the facts pretty much the same way. "As a professional musician," the majority states, "petitioner was required to practice numerous hours in order to maintain, refine, and perfect his skill." We are told that "His practice was admittedly essential to maintain his technical expertise and to learn or review the particular music to be played." Indeed, "orchestra employees were expected to practice indi-

---

[5]See note 1 *supra*.

vidually off the premises. Practice was necessary as a practical matter in order for petitioner to carry out his obligations to the Met." Joint rehearsals were "essential," in the majority's words, to enable the Met to maintain "its performance quality," but, "Of even more importance to petitioner, he, himself, was judged at each rehearsal. *His retention of his job depended on the quality of his playing* at rehearsals as well as at the public performances." (Emphasis added.) In other words, insufficient practice to enable him to perform at the highest level would have cost petitioner his job. The item of fundamental importance to petitioner's job as a concert musician was *his* ability to play up to the extremely high standards his position demands, and he was required to spend the greater part of his time practicing in his studio in order to meet these extremely high standards.[6] Since he spent the greater portion of his time practicing in his studio, and since this was of fundamental importance to his success as a musician (the "retention of his job" to quote the majority), petitioner's studio was his principal place of business.

Accordingly, my disagreement with the majority is not over the facts, but the law. Section 280A(c)(1) permits a deduction for a home office (studio) when it is "the principal place of business" of any trade or business of the taxpayer. We must look at "all the facts and circumstances" to determine which place of business, in light of the activities performed there, is most important to petitioner's trade or business. See sec. 1.280A–2(b)(2), Proposed Regs., 45 Fed. Reg. 52399 (Aug. 7, 1980). Based on the factual picture seen by both the majority and dissenters, the intense and continuous individual practice

---

[6]Petitioner performed between 25 and 26 hours per week at the Met facility at Lincoln Center for slightly more than one-half of the year (about 30 weeks). This includes the "rehearsals" at the Met that the majority correctly notes were of "the entire 93-piece orchestra, differing from a performance principally due to the absence of an audience." Conversely, petitioner practiced on an individual basis approximately 30 hours per week for the entire year. This practice occurred in his home studio, except when he was on tour or at Chautauqua (when he practiced in his hotel room or an apartment). Those facts are not in dispute, and the majority notes that in quantitative terms, petitioner's individual practice in his home studio was predominant *whether we include only his Met activities or also include Chautauqua.* And this seems odd since the majority places great weight on its assertions that Chautauqua (where petitioner earned 17 percent of his income during nearly 2 months) had nothing to do with petitioner's trade of being a musician and required none of his year-round practice. Ignoring Chautauqua on this record seems peculiar, but of no great moment, since, in either case, petitioner's individual practice was his most important activity in both quantitative and qualitative terms.

on a year-round basis is the most important contributing factor to petitioner's success as a concert musician. If the majority followed the statute, this conclusion would be unavoidable.

Unfortunately, this Court has its own test that permits a deduction for a home office (studio) only when it is "the focal point of the taxpayer's activities." See *Baie v. Commissioner*, 74 T.C. 105 (1980). As noted earlier, we correctly held in *Baie* that a fast food franchise (the "Gay Dog") was petitioner's principal place of business although she prepared *some* food in her home kitchen. In *Baie*, we reached the right result for the wrong reason, creating a "source of income" or "focal point" test. Since the sales "generated her income" and the "sales occurred on the premises of the 'Gay Dog,'" we held that those premises were the "focal point" of her activity. 74 T.C. at 109, 110. Unlike the test prescribed by Congress, the focal point test places great emphasis "on the source of income to determine the focal point." See Kulsrud, "New Statutory and Judicial Developments Have Liberalized Home-Office Deductions," 56 J. Tax. 344, 347 (1982). Cf. *Chauls v. Commissioner*, T.C. Memo. 1980–471.[7]

But commerce is not culture, and the sound of the cash register, however sweet, is not the music of the violin. Nevertheless, as in *Baie* and its offspring, the majority focuses on the source of income to determine "the focal point," stating:

A day of missed practice would not be known to the employer. But a missed rehearsal or performance normally would result in *his pay being docked.* [Emphasis added.]

This focal point focus on the cash register leads to other errors. "The most important *business* location," according to the majority, "was the place where public performances were held." (Emphasis added.) (It is here that tickets are sold and redeemed for professional services—the "business" of the Met—and that petitioner is docked for a no-show). Of importance to the majority is the physical presence of the artist in

---

[7]*Chauls v. Commissioner*, T.C. Memo. 1980–471, was correctly decided in part for the right reasons, and in part for wrong reasons. The wrong reason was the following application of the focal point test: "in the *Baie* case, it was the taxpayer's sale of her product that generated the income * * * . Similarly, here it was petitioner's teachings of classes that generated his income."

the spotlight of the arena, where he is watched and "judged by the public," and we are told that the "sole reason for the existence of this orchestra was to perform as a group for the public."[8]

It is clear that the "focal point test," as applied by the majority, sharply restricts the scope of the statute. In focusing on the place where goods and/or services are transferred to customers and clients, the majority makes the "principal place of business" test (sec. 280A(c)(1)(A)) to a significant extent coextensive with the exception for meeting or dealing with customers and clients (sec. 280A(c)(1)(B)). If the business exchange activities the majority focuses on in applying the focal point test (sec. 280A(c)(1)(A)) occur in a home office, it probably already qualifies under section 280A(c)(1)(B) as customers and/or clients would be dealt with. Indeed, since we have broadly interpreted the section 280A(c)(1)(B) exception for meeting or dealing with clients to include a room at home where a taxpayer talks over the phone to customers (see *Green v. Commissioner*, 78 T.C. 428, 433 (1982)), any home office that qualifies under the focal point test of the majority (with its emphasis on the point of business exchange) generally will already have qualified due to client or customer contact.

The focal point test, as applied to this case, imposes the most narrow barriers. Petitioner was a concert musician. He was not compensated simply for performing; he was compensated for performing with complete mastery. Like the author or the artist, petitioner was not simply compensated for the final moments of the long hours he worked every day; he was compensated for the time he worked maintaining, refining, and perfecting his professional skills on a year-round basis, as well as for exhibiting those skills. In arguing otherwise, one

---

[8]No doubt this is where the public (the "consumers" of petitioner's services) focus their attention on petitioner's performance. But it is a non sequitur to conclude that *his* principal place of business necessarily coincides with this *public* focal point. Is the courtroom the most important business location of a trial lawyer, even when he works on a contingent fee basis? This is where the spotlight focuses on his performance as a trial lawyer (the public focal point) and where the payoff is, but isn't preparation infinitely more important? Isn't practice in the studio more important to a concert violinist or pianist giving solo performances on tour or touring with a string quartet? Surely, his principal place of business is his studio and not the various concert halls he plays in, although the spotlight focuses on his performance in the concert hall where he is watched by and judged by the public. That petitioner plays in an orchestra rather than solo, or in a string quartet, should make no difference.

may as well contend that a trial lawyer is compensated solely for his appearance in court.[9] I would hold for petitioner.

FAY, DAWSON, GOFFE, KÖRNER, and SHIELDS, *JJ.*, agree with this dissenting opinion.

KÖRNER, *J.*, dissenting: I must respectfully dissent from the majority in this case. In my view, the erroneous result which the majority has reached here stems from a misapprehension as to the true nature of the taxpayer's trade or business. Having found that this petitioner was in the trade or business of being an employee of the Met, the result which the majority reaches may logically follow; on the other hand, if we were to find (as I think we should) that petitioner was engaged in the trade or business of being a concert musician, an entirely different result would be produced.

Just because a person occupies the status of employee does not necessarily mean that being an employee is his trade or business. A person may carry on a trade or business in many forms and even for different employers and still be in one trade or business. In *Primuth v. Commissioner*, 54 T.C. 374 (1970), cited and relied on by the majority, we did *not* say, as stated by the majority herein, and as suggested by other cases in this Court which have cited *Primuth* as authority, that a person who is an employee ipso facto "is in the trade or business of being an employee." What we *did* say in *Primuth* is that "a taxpayer *may* be in the trade or business of being an employee" (emphasis added), but, in fact, we held in *Primuth* that the petitioner was in the trade or business of being a corporate executive. 54 T.C. at 377. Such trade or business was the same, we held in *Primuth*, even though it was carried on for different employers, and it was the pursuit of this unitary trade or business which made deductible the employment search fees which were in issue in that case.

---

[9]Although an allocation as such is not part of the record, since the gross income so far exceeds the deductions taken by petitioner with respect to his home studio, any reasonable allocation would satisfy sec. 280A(c)(5). See H. Rept. 94–658 (1976), 1976–3 C.B. (Vol. 2) 695, 853–854; S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 49, 187; and Staff of the Joint Comm. on Taxation, 94th Cong., 2d Sess., General Explanation of the Tax Reform Act of 1976, 1976–3 C.B. (Vol. 2) 1, 153.

It is thus clear that it is not correct to hold as a matter of law that an employee is necessarily engaged in the trade or business of being an employee. Although it may be necessary in some cases to characterize an employee in this fashion, because the nature of his services does not fit within any framework that can be identified as a particular trade or business, to classify all persons in an employment status as being in the trade or business of being employees can produce results which are simply ludicrous.[1]

In the instant case, I would find that petitioner's trade or business was that of a concert violinist or musician. So finding, I would give the use of petitioner's home practice studio an entirely different focus. Petitioner was engaged in a unitary trade or business, which he carried on in conjunction with different organizations—the Met, Chautauqua, and perhaps others—in the years before us. His status with respect to these various organizations—as employee, independent contractor, or otherwise—is not particularly material. In carrying on his trade or business, the requirement that he stay in practice was obvious, and his home studio was the only place he had in which to carry on that individual practice while he was in New York, which was the majority of the time in the years before us.

The facts found by the majority as to where petitioner spent his time in his work as a concert musician show that petitioner spent more time working in his home studio than he did working in any other single place, or even all the various places he worked for the Met put together. While the majority correctly states that the number of hours worked in various places is not controlling, it is still significant in making a determination where the principal place of petitioner's business was. *Green v. Commissioner*, 78 T.C. 428, 433 (1982); *Jackson v. Commissioner*, 76 T.C. 696, 700 (1981). Petitioner's home practice studio was essential to him in maintaining his skills as a concert violinist. No matter with whom or for whom he performed, his home practice studio was a constant,

---

[1] I am not prepared to agree that the president of General Motors is in the same trade or business as the janitor in the GM office building. To say that an employee is in the trade or business of being an employee says little more than that a man's trade or business is to work for a living.

running through all the various ways he carried on his trade or business. Even when performing outside New York City, as petitioner did, it is clear to me that the practice petitioner performed at home was of benefit to him on the road. His home practice studio can thus be fairly considered as the "focal point," or the home base, of petitioner's activities as a performing musician, albeit other activities, i.e., group rehearsals and performances, were carried out in a number of other places. See *Baie v. Commissioner*, 74 T.C. 105 (1980).

I think this record supports findings that petitioner was engaged in the single trade or business of being a concert musician, which he carried on with various persons or organizations and, perhaps, in various relationships (e.g., employee, independent contractor, etc.); that his apartment studio was ordinary and necessary in carrying on that trade or business; and that it was his principal place of business, serving him in his necessary practice activities no matter whom he was working for or with at any particular time. It being undisputed in this record that the studio was used exclusively and regularly for petitioner's practice activities and the housing of equipment and materials relating to his trade or business, I would hold that petitioner has satisfied the requirements of section 280A(c)(1), and that the claimed deductions are allowable.[2]

FAY, DAWSON, and GOFFE, *JJ.*, agree with this dissenting opinion.

---

[2]Since the maintenance of his home practice studio is not exclusively related to petitioner's status as an employee of the Met, or any other particular employer, we do not need to consider the convenience-of-the-employer test of sec. 280A(c)(1). Likewise, I agree with Judge Wilbur's dissenting opinion (note 9) that under the facts of this case, any reasonable allocation of income to the home office/studio would satisfy the requirements of sec. 280A(c)(5).