FRANCIS C. AND NANCY J. WEIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Weis v. Commissioner
Docket No. 9482-78.
United States Tax Court
T.C. Memo 1983-178; 1983 Tax Ct. Memo LEXIS 613; 45 T.C.M. (CCH) 1159; T.C.M. (RIA) 83178; March 31, 1983. William H. Lawson Jr., and Susan Callison, for the petitioners. Robert B. Nadler, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined *614 a deficiency in petitioner's 1974 Federal income tax and an addition to such tax under section 6651(a)(1) [1] in the respective amounts of $29,663 and $7,235. After concessions by both parties, [2] the issues for decision are: (1) Whether petitioner Francis C. Weis is entitled to claim a deduction in 1974 for a partially worthless debt, under section 166, for advances made to Clean Air Fuels, Inc. (2) In the event that petitioner Francis C. Weis is not entitled to such a deduction for 1974, whether he is entitled to a bad debt deduction in 1976, which would result in a net operating loss carryback to his 1974 taxable year.
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Francis C. Weis (hereinafter petitioner) and Nancy J. Weis, husband and wife, resided in Memphis, Tennessee, when they filed their petition in this case. They filed their 1974 joint Federal income tax return with the Internal Revenue Service *615 Center, Austin, Texas. During 1935, petitioner's father formed the Weis Butane Company (hereinafter WBC), a closely held corporation. Petitioner's father was the president and majority stockholder of WBC; the remainder of the company's stock was owned by petitioner and other members of the Weis family. The Weis's family business included, among other things, the sale of butane, propane, and equipment that would permit farm tractors which were originally built for gasoline consumption, to operate on propane fuel. Sometime between 1935 and 1948, the Weis family decided to conduct its business through multiple corporations because it wanted to limit any liability it might have as a result of butane accidents (i.e., explosions). Upon his graduation from college in 1948, petitioner began working full-time in the family business. At such time, the business was operated through several corporations in various cities in eastern Arkansas. During 1952, petitioner served as vice-president for one of his family's corporations in West Memphis, Arkansas (hereinafter the West Memphis plant).During 1952 and 1953, the West Memphis plant adopted approximately 4,000 tractors, originally built *616 for gasoline consumption, to run on propane fuel (hereinafter the process of adapting vehicles from gasoline to propane fuel shall be referred to as propane conversion). Propane conversion appealed to many farmers because the price of propane was about 12 cents per gallon less than gasoline during the period from 1952 until 1973. On March 1, 1966, the Weis family business was sold to DX Oil Company (hereinafter DX) for approximately 5 million dollars. Petitioner received $575,000 of the sales price. Pursuant to the sale agreement, certain members of the Weis family, including petitioner, were employed by DX and they agreed not to compete with DX in the propane conversion business for 10 years. Petitioner received a salary of $1,000 per month as an employee of DX, but he became dissatisfied with his job and left the company sometime in 1968. [3]
In 1970, petitioner decided that he wanted to establish a propane *617 conversion business which adapted gasoline powered cars, trucks, and farm tractors to propane fuel. At that time, the price of propane was still about 12 cents per gallon less than gasoline. Since the 10-year period of the aforementioned covenant not to compete had not expired by 1970, petitioner sought legal counsel as to his liability in the event he breached that covenant. An attorney advised petitioner that the Arkansas courts would probably not enforce such a covenant for a full 10 years, but that they would probably enforce it for a 5-year period. On or about June 23, 1972, petitioner, after complying for more than 5 years with the aforementioned covenant not to compete, established an Arkansas corporation named Clean Air Fuels, Inc. (hereinafter CAF), to conduct the propane conversion business. In addition to propane conversion, CAF planned to engage in the retail sale of propane gas. At or about the time of CAF's incorporation, petitioner and 11 other individuals advanced a total of $100,000 to CAF. CAF then issued a total of 2,000 shares of its stock to the 12 incorporators in amounts which were proportionate to the amounts that those individuals had advanced to CAF. *618 Petitioner advanced $50,000 to CAF and he received 50 percent of the company's stock (hereinafter this $50,000 will sometimes be referred to as the 1972 advance). No documents of indebtedness (i.e., notes) were prepared at the time when CAF's incorporators advanced the initial $100,000 to the company. With respect to the initial $100,000 which was advanced to CAF, the company spent approximately $50,000 on land and a building, and $50,000 on equipment. Petitioner was elected to serve as president of CAF and the stockholders agreed that petitioner would receive a salary of $12,000 per year, payable monthly in equal installments. Petitioner received one or two paychecks from CAF during 1972, but none thereafter. Petitioner, however, did not report these wages on his 1972 Federal income tax return. On August 29, 1972, CAF opened for business and began dealing with customers. CAF performed its first propane conversion for a customer, and the company began selling propane to customers on a retail basis. On its 1972 Federal income tax return (Form 1120), CAF reported a loss of $46,566. In order to obtain additional working capital, CAF borrowed $10,915.80 from the Fidelity *619 National Bank (hereinafter Fidelity) and $50,000 from the Union Planters Bank (hereinafter Union Planters) on March 20, 1973 and May 23, 1973, respectively. CAF's loan from Fidelity was personally guaranteed by petitioner and some of the company's other stockholders. CAF's loan from Union Planters was personally guaranteed by petitioner and all of the other stockholders of the company; it was also secured by the company's land and building. During 1973, CAF's financial condition deteriorated to the point where the company was unable to pay all of its obligations as they came due. Some of CAF's suppliers, which had previously provided credit to CAF, began requiring that the company pay for its supplies in the form of cash or a bank check prior to delivery. During 1973, petitioner began advancing money to CAF to help the company meet its obligations (hereinafter such advances will sometimes be referred to as the 1973 advances). CAF neither issued nor executed any documents which evidenced that such advances were loans. On its 1973 Federal income tax return CAF reported a loss of $110,810. By March 31, 1974, petitioner had advanced $60,633 to CAF in addition to the $50,000 *620 which he had transferred to the company at the time of its incorporation. CAF used these advances to meet existing obligations, which included payments on the loans which CAF had received from Fidelity and Union Planters. During May 1974, CAF engaged the accounting firm of Seidman and Seidman, Memphis, Tennessee, to prepare a balance sheet and other financial statements with respect to the company's operations. Seidman and Seidman's audit of CAF occurred between March 31 and May 30 of 1974, and confirmed that the company was losing money and operating at a loss. At some point during the course of the audit, petitioner had two notes drawn up in order to indicate that he had loaned a total of $85,633 to the company. One of the notes was in the amount of $25,000 and was backdated to October 1, 1972; the other note was in the amount of $60,633 and was backdated to March 31, 1974. Both of these notes provided that CAF would pay petitioner 6 percent interest per year. Petitioner continued to advance funds to CAF between March 31, 1974 and December 31, 1975, but no notes were ever drawn up to indicate that such advances constituted loans to the company. During the entire period of *621 CAF's existence, petitioner was able to, and did, withdraw cash from the company without the approval of any other officers or employees. CAF's financial condition continued to deteriorate during 1974 and 1975. The company reported losses totalling $117,950 and $151,715 on its Federal income tax returns for 1974 and 1975, respectively. During July 1976, petitioner hired a certified public accountant named Cory Haraway (hereinafter Haraway) to prepare his and CAF's Federal income tax returns for 1974 and 1975. Petitioner informed Haraway that he had loaned $132,196 to CAF as of December 31, 1974, and that between 50 to 90 percent of that debt was worthless. Petitioner further informed Haraway that he wanted to deduct 50 percent of the $132,196, or $66,098, as a partially worthless debt on his 1974 Federal income tax return. Neither petitioner nor CAF had written off any portion of petitioner's advances during 1974, and Haraway failed to make any analysis of the relative worthlessness of petitioner's advances to the company at the time when he prepared petitioner's 1974 return. On or about December 12, 1975, CAF ceased dealing with customers, but it still held accounts receivables, *622 real estate, equipment, and other assets into 1976. On petitioner's 1974 Federal income tax return, he claimed a business bad debt deduction in the amount of $66,098. In the notice of deficiency, respondent disallowed such deduction on the ground that $25,000 of such amount represented a contribution to capital and the balance was a personal loan, nonbusiness in nature, which was only partially worthless in 1974. [4] Respondent alternatively determined that the entire $66,098 was a nonbusiness debt which was only partially worthless as of December 31, 1974. In his petition, petitioner alleged that respondent's determination that the $66,098 claimed bad debt was nonbusiness in nature was erroneous and that the amount claimed represented a business bad debt. Petitioner then filed an amended petition wherein he alleged that if the "business bad debt is determined not to have been partially worthless in 1974, then the business bad debt became worthless in the taxable year 1976 *623 in the amount of $104,940." The amended petition further states that such a bad debt for 1976 would give rise to a net operating loss for such year, which in turn would result in a loss caryback in the amount of $78,309 for 1974. [5]
OPINION Petitioner contends that he is entitled to claim $66,098 as a business bad debt deduction in 1974 because: (1) at least 50 percent of his total advances to CAF as of December 31, 1974 (i.e., $132,196), was worthless; and (2) his dominant motive in making the advances to CAF was to maintain his employment with such company. Respondent, on the other hand, maintains that petitioner's claimed $66,098 had debt deduction is not deductible for the following reasons. First, respondent contends that $25,000 of such amount represents a portion of petitioner's 1972 advance to CAF at the time of the company's incorporation, and respondent maintains that the entire amount of the 1972 advance (i.e., $50,000) *624 was a contribution to capital. Second, respondent maintains that the balance of the claimed $66,098 amount represents a nonbusiness debt which petitioner failed to establish was wholly worthless on December 31, 1974. As an alternative position, respondent determined that the entire $66,098 constituted a nonbusiness debt which was wholly worthless on December 31, 1974. For the reasons set forth below, we hold for respondent. We first consider respondent's determination that $25,000 of the $66,098 which petitioner claimed as a bad debt in 1974 was actually a contribution to the capital of CAF. Respondent's determination is presumptively correct and petitioner bears the burden of proving otherwise. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Upon considering the record herein, we hold that petitioner has failed to carry his burden of proof. At trial, petitioner testified that CAF was organized with a one to one debt-equity ratio. According to petitioner, half of the funds which CAF received from its 12 incorporators *625 was for stock, and the other half of such funds was for debt. Thus, petitioner argues that only $25,000 of the $50,000 which he advanced to CAF upon its incorporation was for stock, and that the remainder was a loan to the company. In support of his position, petitioner points to an unexecuted copy of the $25,000 note which was drawn up between March 31 and May 30 of 1974, but backdated to October 1, 1972. While we have given consideration to this evidence, we find it interesting that the record contains no mention of CAF issuing notes to any of its other incorporators. Although a written note is not a necessary element to establish the existence of a debt for tax purposes, the absence of any indication in the record that notes were issued to CAF's other incorporators is conspicuous to say the least. Petitioner contends that $25,000 of his $50,000 advance to CAF during 1972 was a loan, but it is quite possible, on the record before us, that petitioner's entire 1972 advance to CAF was a contribution to capital. After all, the $25,000 note was drawn up at a time when CAF was encountering financial problems, and petitioner may have considered that a bad debt deduction, if allowed *626 by respondent, would permit him to recoup a portion of his investment in CAF by reducing his 1974 Federal income taxes.After carefully considering the capital contribution issue, we find that the record lacks sufficient credible evidence to support petitioner's position that $25,000 of his 1972 advance to CAF was a loan. [6]
We next consider whether petitioner is entitled to deduct the remainder of his claimed $66,098 bad debt, that is, $41,098. Section 166(a) generally *627 allows taxpayers a deduction for any debt which becomes worthless during the taxable year. A noncorporate taxpayer, however, is not allowed a deduction for a partially worthless nonbusiness debt; instead, he must wait until the nonbusiness debt becomes wholly worthless. Section 166(d) and section 1.166-5(a)(2), Income Tax Regs. In the case of business bad debts, however, a noncorporate taxpayer is allowed a deduction for their partial worthlessness. Petitioner is a noncorporate taxpayer. He concedes that his advances to CAF were only partially worthless as of December 31, 1974, as he only deducted 50 percent of his claimed advances on his 1974 Federal income tax return. Consequently, in order to establish his right to a partially worthless debt deduction, petitioner must establish that his advances to CAF as of December 31, 1974 (other than the aforementioned contributions to capital), constituted a business bad debt. In order for a loss on a loan to be deductible as a business bad debt, the loan must be proximately related to a taxpayer's trade or business. *628 Whipple v. Commissioner,373 U.S. 193, 201 (1963); Putoma Corp. v. Commissioner,66 T.C. 652, 673 (1976), affd. on other issues 601 F. 2d 734 (5th Cir. 1979); section 1.166-5(b) Income Tax Regs. In order to establish that petitioner's loan [7] to CAF was proximately related to his trade or business as a corporate employee, [8] petitioner must establish that the dominant motive for making the loan was the protection of his employment rather than his investment interest as a shareholder. United States v. Generes,405 U.S. 93 (1972). The determination of petitioner's dominant motive is essentially a factual inquiry with the burden of proof on petitioner. Smith v. Commissioner,55 T.C. 260 (1970), remanded for consideration in light of Generes at 457 F. 2d 797 (5th Cir. 1972), opinion on remand 60 T.C. 316 (1973). *629 Petitioner argues that his dominant motive in loaning money to CAF was to maintain his employment with the company. Petitioner contends that he anticipated that his salary from CAF would be increased to $35,000 per year as soon as the company had an annual profit of approximately $350,000. Such a contention must be objectively examined in light of the overall record. At the outset, we note that petitioner agreed to work at CAF for $12,000 per year, payable monthly in equal installments. Moreover, petitioner only actually received one or two monthly paychecks from CAF during the entire period of CAF's existence. [9] By arguing that he anticipated receiving $35,000 per year from CAF once the company became very successful, petitioner apparently concedes the futility of arguing that he advanced $138,196 to CAF in order to protect a $1,000 per month salary which he never actually received beyond the first few months of CAF's existence. While petitioner might have had the expectation of future salary payments of a substantial nature, as we stated in Putoma Corp. v. Commissioner,supra at 674, *630 "a loan motivated by one's status as an employee seems more plausible where its objective is to protect a present salary, rather than promote a future one." Thus, we do not find petitioner's claim that he had an expectation of large future salary payments to be a compelling argument that his dominant motive in advancing funds to CAF was to protect his employment. [10]
A comparison of the size of a taxpayer's investment in the corporation relative to his employment income is a major factor in determining his dominant motive. [11]United States v. Generes,supra 106; Putoma Corp. v. Commissioner,supra at 66 T.C. 674, note 32. If the taxpayer's after-tax salary is small relative *631 to his original stock investment in the corporation then it is unlikely that the taxpayer's employee interest was the dominant motivation for the loan. In Generes, critical to the Supreme Court's conclusion that the taxpayer's employee interest was not the dominant motivation for the loan was the fact that the taxpayer's after-tax salary was only about one-fifth of his original stock investment. [12] In the instant case, petitioner was authorized to receive an annual salary of $12,000, but he never received more than $2,000 in salary from CAF during the entire period of the company's existence. Petitioner has failed to disprove respondent's determination that his original stock investment in CAF was other than $50,000 and his actual after-tax salary was less than one-twentyfourth of such investment during 1972, and from 1973 through 1976, petitioner did not receive any salary. [13] Clearly, a comparison of petitioner's investment in CAF relative to his employment income indicates that it is highly improbable that his dominant motive for advancing funds was to protect his employment.[14]
*632 During the period that petitioner was advancing substantial funds to CAF, petitioner's salary payments dwindled to nothing. CAF suffered substantial losses during each year of its existence and the record discloses no basis for us to conclude that petitioner could have reasonably believed that CAF's bleak financial situation would improve. [15] Thus, as the amount of funds that petitioner placed at risk in the business (i.e., capital contributions plus loans) steadily increased, his prospects for receiving any compensation for his services steadily decreased. [16] Under these circumstances, petitioner's argument that he was making advances to CAF in order to protect his employee interest is particularly unconvincing. *633 Viewing the record as a whole, we do not believe that petitioner has demonstrated that his dominant motivation in making the advances was related to his status as an employee. Consequently, we hold that the advances which petitioner made to CAF through December 31, 1974 (other than the contributions to capital), were nonbusiness loans which petitioner failed to establish were wholly worthless as of that date and, therefore, not deductible. [17]
Petitioner alternatively argues that if his claimed bad debt deduction for 1974 is disallowed then he sustained a loss from a business bad debt in 1976 as a result of advances to CAF which had become worthless during that year. Petitioner further contends that such a loss gives rise to a net operating loss carryback to 1974 in the amount of $53,309. [18] Respondent disagrees and maintains that the advances which petitioner alleges became worthless in 1976 were contributions to capital and, therefore, not deductible. For the reasons set forth below, we hold for respondent. *634 To be deductible under section 166 a loss must be attributable to a bona fide debt, which is defined in section 1.166-1(c), Income Tax Regs., as "a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." A bona fide debt does not arise where the purported debt is worthless at the time that it is acquired. Putnam v. Commissioner,352 U.S. 82, 88-89 (1956). In this respect, no deduction is allowable if at the time the advances were made, the taxpayer had no reasonable expectation of repayment. Arrigoni v. Commissioner,73 T.C. 792, 799 (1980); Thompson v. Commissioner,22 T.C. 507, 517 (1954). To begin with, we assume that the advances which petitioner claims became worthless in 1976 are not the same advances which petitioner sought to deduct in part on his 1974 return. We assume this because the record reflects that during the entire period of petitioner's advances to CAF, which continued *635 well into 1975, petitioner was also making cash withdrawals from CAF. Thus, it is quite possible that petitioner recouped all of the advances which he had made to CAF as of December 31, 1974, by the end of 1975. In any event, petitioner has failed to prove otherwise. [19]
Thus, proceeding from the assumption that the advances which petitioner claims became worthless in 1976 are advances which petitioner made subsequent to December 31, 1974, we conclude that petitioner failed to prove that such advances did give rise to a bona fide indebtedness for the following reasons. First, petitioner's post 1974 advances lack any of the traditional indicia of indebtedness.Petitioner neither argues that such advances were documented by a promissory note, nor does he claim to have had any agreement with CAF with respect to a fixed maturity date for repayment of those advances or receipt of interest or security while such advances were outstanding. Second, *636 petitioner testified that as of December 31, 1974, the prospects for CAF's business were "very, very bleak" and that at least 50 percent of his advances up to that date were worthless. Nevertheless, petitioner, who continued to advance funds to CAF well into 1975, wants us to conclude that he had an expectation that such advances would be repaid by the company. On this record, we hold that petitioner has failed to prove that he reasonably believed that repayment of his post 1974 advances was possible. Consequently, we hold for respondent on this issue. Since petitioner has conceded liability for the section 6651(a)(1) addition to tax in the event that we found a deficiency for 1974, we hold that petitioner is liable for such addition. To reflect concessions made by both parties, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended. ↩
2. We note that petitioner has conceded that in the event we find a deficiency for 1974 then he is liable for the section 6651(a)(1) addition to tax.↩
3. The record indicates that DX was merged into the Sun Oil Company at some point during the course of petitioner's employment at DX. For convenience, however, we have referred to DX as the company which employed petitioner from March 1966 until sometime in 1968.↩
4. Section 166(d)(1) provides that an individual cannot claim a loss on the partial worthlessness of a nonbusiness bad debt. See also section 1.166-5(a)(2), Income Tax Regs.↩
5. After filing his amended petition, petitioner conceded that if his claimed deduction for a partially worthless debt is disallowed for 1974, then his alleged net operating loss in 1976 would only result in a $53,309 loss carryback to 1974.↩
6. On brief, petitioner appears to argue that his claimed $66,098 bad debt deduction for 1974 does not contain any portion of his 1972 advance. Instead, petitioner seems to contend that one-half of his 1972 advance was a nonbusiness debt which became worthless and, thus, deductible in 1976. We reject such an argument because it conflicts with petitioner's own testimony in the record herein. At trial, petitioner testified that his alleged debt portion (i.e., $25,000) of his 1972 advance was included in the $132,196 amount from which he derived his claimed $66,098 business bad debt deduction (i.e., 50 percent of $132,196).↩
7. For purposes of this opinion we are treating all of petitioner's advances to CAF as of December 31, 1974, as a single loan (except the 1972 advance which was a contribution to capital). While we recognize that such advances were transferred to CAF at various times the record does not contain sufficiently reliable evidence upon which we could determine the date when petitioner made such advances and their separate amounts. While petitioner testified that CAF did maintain a cash receipts and cash disbursements journal, he did not produce such journal at the trial. Petitioner did offer into evidence a record purporting to show his advances to, and withdrawals from CAF. He failed, however, to sufficiently explain and substantiate various amounts appearing thereon and, thus, we have not afforded any weight to that record. Another reason for treating petitioner's advances to CAF through December 31, 1974, as a single loan is that petitioner was withdrawing funds from the company during the period that he was making such advances. While the parties agree that the net result was that CAF owed money to petitioner as of December 31, 1974, the record contains no reliable basis for determining which advances CAF was paying back to petitioner at the time that he withdrew funds from the company. ↩
8. It is well settled that being an employee can constitute a trade or business. Trent v. Commissioner,291 F. 2d 669 (2d Cir. 1961); Eisenberg v. Commissioner,78 T.C. 336, 348 (1982); Shinefeld v. Commissioner,65 T.C. 1092, 1098-1099 (1976); Drucker v. Commissioner,79 T.C. 605, 612↩ (1982).
9. As noted in our findings of fact, the paychecks which petitioner received from CAF were issued to him during 1972. ↩
10. We note that petitioner's claim that he had expectations of substantial future salary payments at the time that he advanced the funds in issue lacks credibility because of CAF's poor financial condition at all relevant times herein.↩
11. See also Baker v. Commissioner,T.C. Memo. 1981-137↩. 12. In United States v. Generes,405 U.S. 93↩ (1972), the taxpayer received a $12,000 annual salary which amounted to $7,000 after his Federal income tax was paid.The taxpayer's original investment in the corporation was $38,900. 13. See Baker v. Commissioner,T.C. Memo. 1981-137↩, where we considered the salary actually received by the taxpayer as compared to the total amount of funds he had placed at risk in the business (i.e., capital contributions plus loans) in reaching a decision that the taxpayer's advances were not intended principally to secure his employment.
14. Even if we were to consider petitioner's authorized salary of $12,000, as opposed to the salary which he actually received, his after-tax authorized salary was less than one-fifth of his original investment in CAF.↩
15. Petitioner testified that the major reason for CAF's losses for 1973 through 1976 was an Arab oil embargo which drove up the price of propane and made it less economical to convert vehicles from gasoline to propane consumption. Petitioner claims he continued to advance funds to CAF on the basis of conversations that he had with people in the oil industry that propane prices would eventually decline. Petitioner presented absolutely no proof to support such a sweeping claim of such a self-serving nature. For example, the record indicates that the price of gasoline as well as propane rose during this period, but there is no evidence aside from petitioner's self-serving claims, that it had become uneconomical to adapt a vehicle for propane consumption. Moreover, petitioner's general claim that he spoke with oil industry officials who were optimistic with respect to the future of his business is also self-serving. Petitioner failed to call any of these oil industry officials to testify, and he did not even mention any of their names and qualifications for the record. ↩
16. See Baker v. Commissioner,T.C. Memo. 1981-137↩.
17. Petitioner has never claimed that his advances to CAF were wholly worthless on December 31, 1974, and the record lacks any credible evidence to the contrary.↩
18. See note 5, supra.↩
19. In this connection, we note that petitioner did submit a document which purported to keep track of his various advances to, and withdrawals from, CAF. For reasons stated in note 7, supra,↩ however, we do not rely on such record.